AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of South Dakota

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* Information associated with Facebook User P.T. and Facebook ID 100010177033015 that is stored at premises controlled by Facebook Inc. | ) ) ) ) ) ) Case No. 5:19-MJ-148 **SEALED** |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of ____ **South Dakota** ____
*(identify the person or describe the property to be searched and give its location)*:

IN THE MATTER OF THE SEARCH OF: Information associated with Facebook User P.T. and Facebook ID 100010177033015 that is stored at premises controlled by Facebook Inc.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence of a crime of Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 2241(c) and 1153, as outline in the affidavit in support of the search warrant, which is incorporated herein by this reference.

I find that the affidavit, or any recorded testimony, establishes probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before *December 30, 2019* *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ **Daneta Wollmann** _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *12-16-19   10:02 am*          _____
                                                                                 *Judge's signature*

City and state:       Rapid City, SD                   Daneta Wollmann, U.S. Magistrate Judge
                                                                             *Printed name and title*

CC: AUSA Poppen + Agent
Cox

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>5:19-mj-148 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of South Dakota

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with Facebook User P.T.
and Facebook ID 100010177033015 that is stored
at premises controlled by Facebook Inc.

Case No. 5:19-mj-148

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachments A and B

located in the _____ District of ____South Dakota____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments A and B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. § 1001 | False Statement | |
| 18 U.S.C. § 5032 | Juvenile Delinquency | |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA . KEVIN SEYMORE
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **12 - 16 - 19**

_____
*Judge's signature*

City and state: Rapid City, SD

Daneta Wollmann, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

IN THE MATTER OF THE SEARCH
OF: Information associated with
Facebook User P.T. and Facebook
ID 100010177033015 that is stored
at premises controlled by Facebook
Inc.

Case No. 5:19-MJ-148

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

State of South Dakota    )
                         ) ss
County of Pennington     )

I, Kevin J. Seymore, Special Agent of the Federal Bureau of Investigation
FBI being duly sworn, states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation
(FBI), and I am assigned to the Rapid City Resident Agency, Rapid City, South
Dakota.  I have been a Special Agent (SA) with the FBI since May 2018.  I am
currently assigned to a criminal squad with the Minneapolis Division of the FBI,
Rapid City Resident Agency, and investigate a multitude of Federal criminal
violations, including crimes in Indian country on the Pine Ridge Reservation.
During that time, I have investigated federal crimes occurring within Indian
country, including violations of 18 U.S.C. § 1001, False Statement and 18 U.S.C.
§ 5032 Juvenile Delinquency.

2.    The information set forth below is based upon my knowledge of an investigation conducted by the FBI and the investigation of other law enforcement agents and officers.    I have not included each and every fact obtained pursuant to this investigation, but have set forth those facts that I believe are essential to establish the necessary probable cause for the issuance of the search warrant.

3.    I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.    The information to be searched is described in the following paragraphs and in Attachment A.    This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 1001, False Statement and Juvenile Delinquency (hereinafter "Target Offense") to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, as described in Attachment B.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of a violation of the Target Offense is present in the account of Facebook User P.T. and Facebook ID 100010177033015 that is stored at premises controlled by Facebook Inc. (hereinafter "the account").     There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as further described in Attachment B.

## PROBABLE CAUSE

6.     Your affiant believes there is probable cause that the Facebook account of P.T., will yield evidence of the crime of False Statement and Juvenile Delinquency, in violation of 18 U.S.C. §§ 1001 and 5032.  Your affiant believes that P.T.'s account will contain evidence in the form of P.T.'s statements pertaining to the events of November 12, 2019, and previous meetings between "Deej," later identified as Donald Kills Warrior Junior, on November 8-9, 2019, as well as geolocation history pertaining to the crime of False Statement and Juvenile Delinquency.

7.     Your affiant learned on November 12, 2019, that P.T. made a report to Oglala Sioux Tribe Department of Public Safety Officers (OST DPS) Wilson Quintana and Isaiah Crow that two males attempted to sexually assault her earlier that evening.  P.T. is currently 16 years of age.

8.     Your affiant spoke with OSTDPS Officers Quintana and Crow.  Your affiant learned from the officers that P.T. told the officers that on or about

3

November 12, 2019, she was with her friend, possibly "Jamie Steele," at a white FEMA trailer near Wounded Knee water tower. P.T. told officers that on Tuesday, presumably, November 12, 2019, her friend left and that she needed a ride (to her residence near Allen, SD). P.T. used Facebook to contact "Deej," whom she believed was Jamie's brother. P.T. told officers that "Deej" came to the trailer and was driving a silver Jeep. P.T. got into the jeep with "Deej." P.T. told officers that a male named "Gordon" was driving a black truck, following "Deej" and P.T. Facebook messages taken from P.T.'s phone on November 12, 2019, identified the truck as a "Ford x400."

9.      P.T. told officers that while traveling on one of the dirt roads, that they pulled her from the vehicle, brandished a knife, and with physical force attempted to sexually assault her by removing her clothing.

10.      For reasons not disclosed during the initial narrative, P.T. advised the attempted sexual assault ended and that she was placed back into the passenger compartment of the vehicle.

11.      P.T. told officers that from that remote area near Allen, SD, they went to Lil' Angel's in Kyle, SD. At Lil' Angels, P.T. stated that they got out and she was able to grab the knife and escape the vehicle. P.T. told officers that she ran to the Little Wound School where she made contact with her basketball coach, Sadie In the Woods, who then contacted OSTDPS.

12.      On November 13, 2019, Federal Bureau of Investigation Intelligence Analyst Kelley Woodward-Quick used open source research to confirm the likely

4

identities of "Deej" and Gordon as Donald Kills Warrior Junior and Gordon Weston, respectively.

13. On November 13, 2019, your affiant observed the forensic interview of P.T. at the Children's Advocacy Center in Rapid City. During her interview, P.T. advised that she had received a message from her minor friend, "Jamie," later identified by your affiant as, J.L.D, to hang out. P.T. said that J.L.D. picked her up and drove her to J.L.D's residence in the Wounded Knee area.

14. P.T. advised that "Deej" was at J.L.D.'s residence and offered to give P.T. a ride to her residence in Allen, SD. P.T. told the interviewer that the attempted sexual assault took place in the back of the silver Jeep. Once parked on the secluded dirt road, P.T. stated that the pair, "Deej" and Gordon, removed her from the passenger's seat and placed her in the back cargo area of the vehicle. Gordon brandished a knife, which Gordon handed to "Deej." "Deej" held the knife up to P.T.'s throat, threatening to harm her, and attempted to remove her shirt and pants.

15. During the November 13, 2019, forensic interview, P.T. gave a different narrative in which "Deej" met Gordon at an unidentified location, and Gordon followed in a purple Camaro, rather than Gordon driving a black truck.

16. P.T. advised the forensic interviewer that the pair ceased attempting to sexually assault her in the back of the vehicle when a car, possibly an OSTDPS vehicle, drove past. P.T. told the forensic interviewer that from that remote location, she and "Deej" then drove to Lil' Angel's in Kyle, SD. P.T. was uncertain

5

where Gordon went after the attempted sexual assault.  P.T. told the forensic interviewer that when "Deej" exited the vehicle to go to Lil' Angel's, P.T. fled the vehicle of the Jeep and ran to the Little Wound School.

17.    P.T. told the forensic interviewer that during this abduction she was in contact with her basketball coach, Sadie In The Woods, via Facebook Messenger.  She provided copies of those contemporaneous messages to your affiant on November 12, 2019.  The messages to In The Woods state that she has been abducted.  In the messages, P.T. tells In The Woods that "Deej" took her to a secluded location and that an individual named Gordon arrived in a truck.  She failed to provide location sharing data via Facebook with In The Woods despite In The Woods' requests that P.T. do so, and despite P.T. having done so previously in the same conversation.  Through the investigation, your affiant learned that Gordon owns a purple Camaro, a maroon Chevrolet C1500 which resembles a Chevrolet Silverado truck, a Chevrolet Tahoe, and a Chevrolet Impala.  The messages do not mention that Gordon was present nor a party to the abduction.

18.    During the forensic interview, P.T. stated to the interviewer that she had never met "Deej" or Gordon prior to November 12, 2019.

19.    Following the conclusion of the forensic interview on November 13, 2019, P.T. provided Facebook Messages between P.T. and "Deej".  The last two messages from "Deej" state: "Send me your location" sent at 5:27 PM on November 12th, and "You make it back?" at 9:39 PM on November 12th.  P.T.

6

also noted to the interviewer and your affiant that she had left several of her clothes and purse at the residence in Wounded Knee.

20.    On November 13, 2019, your affiant reviewed the surveillance video at Lil' Angel's. The surveillance video shows "Deej" park the Jeep, exit the Jeep to enter the store where he purchases two cans of chewing tobacco, and then shows him exiting the store to return to the vehicle. At no point in the video does a young female exit the vehicle. The vehicle is visible continuing east towards Little Wound School. Although it is clear from the video that there is a passenger in the Jeep, this video directly conflicts with P.T.'s report that she fled the vehicle while he was inside the gas station.

21.    During the forensic interview, your affiant also learned that P.T. had been drinking at a residence Veteran's Day weekend. P.T. told the interviewer that "Deej" was not there, but she communicated with "Deej" via Facebook to seek a ride from the residence.

22.    On November 15, 2019, your affiant interviewed Donald Kills Warrior Junior, a/k/a "Deej", in the parking lot at Rockyford School where he is employed as a teacher's aide and bus driver. "Deej" said that he and P.T. had only been speaking about two weeks and that he added her as a friend on Facebook based on a Facebook friend suggestion option.

23.    "Deej" told your affiant that he picked P.T. up from a residence near the Wounded Knee water tower. "Deej" advised your affiant of the route that he used from Wounded Knee to Allen, SD. The route that "Deej" described involved

7

taking BIA Route 27 south to US 18, US 18 east to "Boondock's Road," (approximately one mile east of Swett, SD), then "Boondocks Rd" north to Allen, SD, which is where P.T. resides.

24. "Deej" further told your affiant that while in the vicinity of Allen, SD, P.T. requested "Deej" drop her off at Little Wound School in Kyle, SD, instead of her residence. "Deej" used BIA Route 4 Northwest through Yellow Bear Canyon to Kyle, SD. "Deej" advised your affiant that throughout the entire drive, P.T. used her phone via a hotspot that "Deej" had set up with his own phone.

25. "Deej" confirmed with your affiant that prior to dropping P.T. off at Little Wound School he went to Lil' Angels gas station in Kyle, SD, and purchased two cans of chewing tobacco. Lil' Angels surveillance footage from the interior of the store confirms this purchase. "Deej" further stated that following the stop at Lil' Angels, he and P.T. continued to Little Wound, where P.T. exited the vehicle without incident. P.T. voluntarily gave "Deej" a kiss on the mouth at this time. "Deej" told your affiant that he did not attempt to prevent P.T. from exiting the vehicle at any time.

26. "Deej" disclosed to your affiant that he had previously met with P.T. on Friday, November 8, 2019, and Saturday, November 9, 2019. "Deej" picked up P.T. near the Allen post office both times. During these encounters, "Deej" and P.T. drove around Yellow Bear Canyon and the Swett/Batesland/Martin area. On Saturday, at P.T.'s request, "Deej" dropped P.T. off at Pinky's store in

8

Manderson, SD. "Deej" believed that P.T. entered a tan GMC vehicle after being dropped off.

27.    "Deej" advised your affiant that he had no knowledge or contact with anyone named "Gordon" and specifically did not know "Gordon Weston.". "Deej" also advised your affiant that he would not attempt to contact P.T. further.

28.    "Deej" also stated that after dropping P.T. off at Little Wound School, he sent her messages inquiring as to whether she made it to where she needed to be. See paragraph 19. "Deej" also did not know that P.T. was only 15 years of age. "Deej" told your affiant that P.T. told him that she was 17 years of age.

29.    On November 15, 2019, your affiant interviewed Gordon Weston at his residence in Oglala, SD. Gordon confirmed that he and P.T. had been friends on Facebook since approximately August 2019, when P.T. had stayed overnight at the Emergency Youth Shelter (EYS) where Gordon is employed. Gordon could not recall who made the initial friend request. Gordon elaborated that many employees from EYS are friends with juveniles that had previously stayed at EYS.

30.    Gordon told your affiant that P.T. had previously asked Gordon for a ride in September 2019. Wanting to help P.T., Gordon picked P.T. up in Allen, SD, and took P.T. along to Rapid City while Gordon completed some shopping at Walmart. Gordon took P.T. for lunch at Qdoba and then back to Allen, SD. Gordon denied making any sexual contact with P.T. during this trip.

31.    Gordon further advised your affiant that contact after this day was sporadic and infrequent. On November 12, 2019, P.T. sent Gordon a message

9

via Facebook asking for a ride from Wounded Knee. Gordon advised P.T. that he was busy until later that evening and did not receive a further response from P.T. Gordon told your affiant that he went to Pine Ridge at approximately 4:00 PM to conduct financial business and returned home when complete. Gordon remained at his home with his 11-year-old son the rest of the evening. Gordon denied any travel to Wounded Knee or any areas on the eastern side of the reservation.

32.     Gordon told your affiant that he had no knowledge of anyone named "Deej" or "Donald Kills Warrior Junior."

33.     On November 19, 2019, Gordon submitted to a polygraph examination. Gordon ultimately failed the polygraph as deception was indicated with regard to questions pertaining to whether he "held [P.T.] down" in a jeep in November 2019. Two other versions of this question were asked to Gordon. In a post polygraph interview Gordon maintained his innocence. Subsequent to the polygraph, an alibi witness came forward stating that he was with Gordon on the evening of November 12, 2019.

34.     On November 20, 2019, your affiant spoke with P.T. at the Kyle Indian Health Services Hospital in Kyle, South Dakota. P.T. advised she knew "Gordon" from the Emergency Youth Shelter, and he has sent her sexually suggestive Facebook messages since approximately August through November. P.T. noted that Gordon had asked P.T. to accompany him during an upcoming

10

vacation to Florida on November 25, 2019. P.T. denied ever meeting Gordon in September 2019.

35.   On November 20, 2019, P.T. viewed the previously mentioned surveillance footage from Lil' Angels. P.T. stated that after the silver jeep exited the video frame, "Deej" attempted to touch her sexually. P.T. stated that it was at that time that she exited the vehicle, ran across the road, and used a trail on the north side of the road to travel on foot to Little Wound School. This contradicted the November 12 and 13, 2019, interviews in which P.T. stated that she left while "Deej" was inside. P.T. was unable to provide a reason for why she waited until the vehicle was in motion and did not leave during the approximately 2.5 minutes that "Deej" was inside the store.

36.   Your affiant also learned from P.T. that she communicated with "Deej" through Snapchat and Facebook messenger since August of 2019. P.T. told your affiant that she had physically met "Deej" in August 2019. P.T. denied that she had seen "Deej" since then, aside from the incident on November 12, 2019. P.T. clarified that on Saturday, November 9, 2019; she took the bus to Manderson, SD, and did not ride with "Deej." This contradicted both "Deej's" November 2019 statement and P.T.'s November 13, 2019, interview.

37.   Your affiant was aware that the phone belonging to P.T. only has internet access when connected to Wi-Fi. On November 20, 2019, P.T. told your affiant that she was able to access Facebook Messenger and send messages to In The Woods on November 12, 2019, via a personal hot-spot that she always

11

has with her. However, P.T. was unable to produce the hot-spot as P.T. had lent it to another student that morning. When asked by your affiant why P.T. took the hot-spot but did not take her purse or clothing from the residence in Wounded Knee where she was picked up by "Deej", P.T. advised that she was planning on coming back to the residence later that night to retrieve them.

38. On November 20, 2019, your affiant received a report written by an OSTDPS officer regarding a November 18, 2019, arrest of "Deej." The report included a handwritten statement from P.T. stating that "Deej" had been harassing and stalking P.T. The report also had a photograph of a cell phone displaying a message. The report detailed how P.T. claimed that "Deej" sent her messages on November 18, 2019, at 11:10 AM. See paragraph 19. The message states "Send me your location." It appears that the original time and date has been redacted or blacked out, and no date or time stamp appears on the message that was provided to OSTDPS officers by P.T. Based on this statement and photo, "Deej" was arrested on tribal charges of harassment. The photograph of the message attached to the tribal police report are messages known to your affiant to have been previously sent on November 12, 2019, by "Deej" to P.T. as noted in paragraph 19.

39. On or about December 11, 2019, your affiant reviewed surveillance video from Little Wound School from the evening of November 12, 2019. The video footage shows a light-colored Jeep Renegade, similar in appearance to "Deej's" vehicle, pulling into the Little Wound School parking lot at approximately

12

6:45 PM. After a brief period of inactivity, the footage skips ahead a few seconds, at which time P.T. is visible outside the vehicle's passenger side in no apparent distress. It appears the driver gets P.T.'s attention and P.T. returns to visit with the driver. P.T. looks towards the school and away before quickly kissing the driver at a non-visible location on his face through the driver's side window. P.T. then quickly exits out of the view of the camera, towards the school. This video footage is in direct contradiction to P.T.'s statement during the forensic interview and with your affiant, in which P.T. claimed to escape from the vehicle in the vicinity of Lil' Angels store in Kyle, SD, and run to the school. The footage is consistent with a statement given by "Deej" on November 15, 2019, in which "Deej" identified himself as the driver of the Jeep Renegade and admitted to giving P.T. a kiss on the mouth prior to dropping her off at the school without incident.

40.    Your affiant believes that based on the conflicting statements offered by P.T. and the fact that P.T. disclosed varying details regarding communication between "Deej" and Gordon, there is probable cause to search the Target Account for evidence of a crime involving 18 U.S.C. §§ 1001 and 5032.

## INFORMATION ON FACEBOOK

41.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows individuals to specifically communicate with another person through a Facebook application called "Messenger." In my training and experience, people

who engage in online criminal activity often also utilize Facebook to meet victims and other offenders and to chat.  Even if Facebook was not utilized in the chat at issue, there is probable cause to believe there will be evidence regarding the online solicitation of minors within the target Facebook account.

42.   Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

43.   Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

44.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange

14

communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

45.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

46.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also

15

includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

47.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

48.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and

although Facebook does not record the calls themselves, it does keep records of the date of each call.

49.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

50.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (*i.e.;* non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

51.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but people who visit the user's Facebook page cannot viewed it.

52.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

53. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

54. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

55. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

18

56.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

57.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

58.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude

19

the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the user accessed or used the account. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining, the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to

20

the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

59.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

60.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST/JUSTIFICATION FOR ORDER OF NONDISCLOSURE

61.    The United States respectfully applies for an order of nondisclosure to Facebook under 18 U.S.C. § 2705(b) regarding the account associated with P.T. and Facebook ID 100010177033015 that is stored at premises controlled

by Facebook Inc., (hereinafter "the account").  The United States is seeking this search warrant for user information, including all names, addresses, IP addresses, including historical, telephone numbers, other email addresses, information on length and types of services and any means of payment related to these accounts under the authority given by 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).  Based on § 2703(c)(3), the United States is not required to provide notice to the subscriber.  Under § 2705(b), the United States may apply to the court for an order commanding Facebook not to notify the subscriber of the existence of the search warrant.  The court may decide what length of time shall apply to the order of nondisclosure if the court determines the notification to the subscriber could result in one of the five factors listed in the statute, which includes destruction of or tampering with evidence.  18 U.S.C. § 2705(b)(3).  The basis for the request is that such disclosure could cause any person with access to the accounts, or any related account or account information, to tamper with or modify the content or account information and thereby destroy or tamper with evidence and otherwise seriously jeopardize the investigation.  Especially due to the ease of access to Facebook, its content can be modified by persons with internet access and sufficient account information. As such, the United States respectfully requests this Court enter an order commanding Facebook not to notify the user of the existence of this warrant.

22

## REQUEST FOR SEALING

62.     I request that the Court order that all papers submitted in support of this application, including this affidavit, the application, the warrant, and the Order itself, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## CONCLUSION

63.     Based on the forgoing, I request that the Court issue the proposed search warrant.

64.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).

65.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Dated:  12-16-19

Kevin J. Seymore, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to in my presence
this 16th day of December, 2019.

DANETA WOLLMANN
U.S. MAGISTRATE JUDGE

23

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook User P.T. and Facebook ID 100010177033015 that is stored at premises owned, controlled, maintained or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

## I.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including for: User P.T. and Facebook ID 100010177033015 that is stored at premises controlled by Facebook Inc., full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)   All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall

postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)  All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)  All "check ins" and other location information;

(g)  All IP logs, including all records of the IP addresses that logged into the account;

(h)  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)  All information about the Facebook pages that the account is or was a "fan" of;

(j)  All past and present lists of friends created by the account;

(k)  All records of Facebook searches performed by the account;

(l)  All information about the user's access and use of Facebook Marketplace;

(m)  The types of service utilized by the user;

2

(n)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(q)   Any and all geo location data information.

**II.   Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of a violation of False Statement and Juvenile Delinquency, in violation of 18 U.S.C. §§ 1001 and 5032, from July 31, 2019, until the date of the warrant, for the user ID identified on Attachment A.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11) & (13)

I, _____, attest, under penalties of perjury

under the laws of the United States of America pursuant to 28 U.S.C. § 1746,

that the information contained in this declaration is true and correct.  I am

employed by Facebook, and my official title is _____.  I

am a custodian of records for Facebook.  I state that each of the records attached

hereto is the original record or a true duplicate of the original record in the

custody of Facebook, and that I am the custodian of the attached records

consisting of _____ (pages/CDs/kilobytes).  I further state that:

a.      all records attached to this certificate were made at or near the time of the
        occurrence of the matter set forth, by, or from information transmitted by,
        a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted
        business activity of Facebook; and

c.      such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) &

(13) of the Federal Rules of Evidence.

_____          _____
Date                         Signature